UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF AMERICA,

Case No. 08-Cr-20574-LENARD/WHITE

Plaintiff,

vs.                                    MIAMI, FLORIDA
OCTOBER 7, 2009

EFRAIM DIVEROLI, et al.,

Defendants.

PROBABLE SHOW CAUSE HEARING TRANSCRIPT ON VIOLATION OF BOND
RELEASE
BEFORE THE HONORABLE PATRICK A. WHITE,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

UNITED STATES ATTORNEY'S OFFICE
99 N.E. 4th Street
Miami, Florida 33132
BY: ELOISA D. FERNANDEZ, A.U.S.A.

```
 1

 2   FOR THE DEFENDANT DIVEROLI:

 3

 4

 5
                     BLACK SREBNICK KORNSPAN & STUMPF
 6                   201 S. Biscayne Boulevard
                     Suite 1300
 7                   Miami, Florida 33131
                     BY: HOWARD M. SREBNICK, ESQ.
 8

 9

10

11

12                   HY SHAPIRO, P.A.
                     2400 South Dixie Highway
13                   Suite 200
                     Miami, Florida 33133
14                   BY: HY SHAPIRO, ESQ.

15

16   ALSO PRESENT:    MARCO SORINKO, ESQ.

17

18

19
     REPORTED BY:     JERALD M. MEYERS, RPR-CM
20                   J.M. Court Reporting, Inc.
                     1601 N.W. 109 Terrace
21                   Telephone: 954-431-4757
                     Pembroke Pines, Florida 33026-2717
22                   E-Mail Address: CRJM@AOL.COM

23

24

25
```

1  (Call to order of the court)

2          THE CLERK:  Calling the United States of America

3  versus Efraim Diveroli, case number 08-20574-Criminal-Lenard.

4          Counsel, please state your appearances for the

5  record.

6          MS. FERNANDEZ:  Good morning, Your Honor.  Eloisa

7  Fernandez on behalf of the United States.

8          THE COURT:  Good morning to you.

9          MR. SREBNICK:  Good morning, Judge.  Howard

10  Srebnick on behalf of Efraim Diveroli who is present.  Also

11  present is Hy Shapiro who represents the corporation, Aey,

12  Inc.

13          THE COURT:  Okay.  What is that corporation?

14          MR. SREBNICK:  The corporation is a defendant in

15  the case, and it is 100 percent owned by Mr. Diveroli.

16          THE COURT:  Okay.

17          MR. SREBNICK:  Is that what you asked me, what is

18  the corporation?

19          THE COURT:  Yes.

20          MR. SREBNICK:  Yes.  And as well in the courtroom

21  to introduce to you, another attorney working on the case

22  Marco Sorinko and Doctor Steven Strumwasser, a licensed

23  clinical psychologist.

24          THE COURT:  Okay.  Interesting.  Government, where

25  are we at on this matter?

1          MS. FERNANDEZ:  Your Honor, we have been conferring

2    with the U.S. Probation --

3          THE COURT:  I really cannot hear you from that

4    microphone.  Maybe it is the microphone.

5          MS. FERNANDEZ:  Sure.

6          THE COURT:  Thank you.

7          MS. FERNANDEZ:  We have been conferring with the

8    U.S. Probation Officer Lora Estival, on this matter, and I

9    believe at this time we would have, in consultation with

10   probation, as well as defense counsel, some proposed

11   recommendations that, perhaps as a one last chance for this

12   defendant we would submit the combination of these special

13   conditions may permit him the opportunity to abide by the

14   current terms of his release.

15         THE COURT:  Well, tell me the background of this

16   matter.

17         MS. FERNANDEZ:  Sure.  Your Honor, the defendant

18   was released on a bond in June of '08 post, after his

19   initial appearance on an indictment for criminal fraud

20   charges.

21         In July of '08, a month later, approximately, he

22   met with probation.  He did admit that he had had past use

23   of marijuana, cocaine and alcohol.  And based upon that

24   information he went ahead and commenced private counseling in

25   July of 2008.

1          The physician who is present here, Steven

2    Strumwasser, has been actually the attending clinical

3    psychologist since that time.

4          In April of '09, the defendant was admitted in

5    another holistic addition treatment program in North Miami

6    Beach, and at that time the drug tests that were coming back

7    were being reported as negative.

8          THE COURT:  Okay.  Now, these two programs, are

9    they private programs?

10          MS. FERNANDEZ:  These were private programs.

11          THE COURT:  Where you actually have to pay to go

12    into the program?

13          MS. FERNANDEZ:  Exactly.

14          THE COURT:  Okay.

15          MS. FERNANDEZ:  Approximately a month later in May

16    of '09 he was discharged from the program, and on May 21st,

17    almost a week later, he is readmitted into another program,

18    Wellness Resource Center in Boca Raton, Florida.

19          THE COURT:  Now, when you say "discharged," what

20    do you mean?  Was he kicked out or did he complete it, or

21    what?

22          MS. FERNANDEZ:  He had completed it from what I

23    understand.

24          THE COURT:  Okay.  An honorable discharge.

25          MS. FERNANDEZ:  An honorable discharge, if you

1   would.

2          THE COURT:  Okay.  So if he had a discharge from

3   these two places, he went into another place in May?

4          MS. FERNANDEZ:  Yes.  Approximately a week later he

5   goes back into another facility.

6          THE COURT:  Why is it necessary to go back to

7   another one?

8          MS. FERNANDEZ:  This has been --

9          THE COURT:  Your voice.  I am losing your voice.

10          MS. FERNANDEZ:  I am sorry.

11          THE COURT:  Does that mean that you are not

12   certain?

13          MS. FERNANDEZ:  No, no.  There is a pattern which

14   you will see here is, he is drug free for some time and then

15   he slips and goes back, and I am just kind of going through

16   the chronology for you.

17          THE COURT:  Okay.  So are you saying that when he

18   left the program in April and went into another one in May

19   that in between April and May he had some drug experiences?

20          MS. FERNANDEZ:  And this is based on reports that

21   we get from a master out of that one facility who basically

22   ruled and said, "He needs an additional 60 days of further

23   treatment."  These are not test results that are being --

24          THE COURT:  Okay.  Here is my question:  My

25   question is if he has an honorable discharge and then

1    shortly thereafter he goes into another program, why?

2              Was he using drugs again, or something like that,

3    or what happened?

4              MS. FERNANDEZ:  I don't have that information and

5    perhaps probation has that.

6              THE COURT:  Who does?  Counsel, do you have that

7    information?

8              MR. SREBNICK:  Hold on one second.  I am sorry,

9    Judge.

10             The answer is, yes, we do.  The facilities that he

11   was first admitted to were not dual diagnosis facilities.

12   They were simply drug rehabilitation facilities.

13             It became quite clear that Mr. Diveroli required a

14   facility that would accommodate other issues that he had that

15   could not be accommodated by the original facilities.

16             Doctor Strumwasser, who is here today, can

17   describe that for you.  I don't know if we need to do that

18   in open court or sidebar, since it is a medical issue, but it

19   was not because of any positive drug tests.

20             It was simply that the first facility discharged

21   him when it became clear that he would be better suited at a

22   different facility with more resources to address the

23   complications associated with Mr. Diveroli's shall we say

24   chemical imbalances.  Natural brain issues.

25             THE COURT:  Okay.

1        MR. SREBNICK:  So it wasn't simply a drug

2   dependency issue that he was suffering from.  It was in

3   addition certain psychiatric issues that needed to be

4   addressed.

5        THE COURT:  Okay.

6        MR. SREBNICK:  And so the second facility was a

7   residential facility better equipped to handle the full

8   scope of Mr. Diveroli's issues.

9        THE COURT:  The May facility, that was the third

10  facility?

11       MR. SREBNICK:  Yes.

12       THE COURT:  Okay.  So we have got him at the third

13  facility.  Counsel, go ahead.

14       MS. FERNANDEZ:  Throughout that time, we are

15  talking May, June, on June 17th he is discharged from that

16  third facility.

17       No positive drug tests are reported.  Everything

18  is reported to the U.S. Probation Office as negative at this

19  time.

20       THE COURT:  Okay.

21       MS. FERNANDEZ:  Then he goes into an out-patient

22  facility in July of '09.  This is the Village South which is

23  the current facility where he is attending on an out-patient

24  basis.

25       THE COURT:  Okay.  So why was it necessary to go to

1   yet a fourth facility?

2           MS. FERNANDEZ:  I think it was a continuing

3   treatment facility to give him guidance.

4           THE COURT:  Okay.

5           MS. FERNANDEZ:  And he was meeting, I believe it

6   was twice a week.

7           THE COURT:  So he didn't fall off the wagon or

8   anything like that?

9           MS. FERNANDEZ:  Pretty much.

10          THE COURT:  He went to another facility?

11          MR. SREBNICK:  Yes, Judge.  He went from

12   residential to out-patient.

13          MS. FERNANDEZ:  To out-patient.

14          MR. SREBNICK:  A natural progression.  They don't

15   keep them in residential forever.  So at some point they

16   transitioned him to out-patient, and that's why you have that

17   next facility.

18          THE COURT:  Okay.  So so far we have had three

19   residential and now we have an out-patient.

20          MR. SREBNICK:  No.  It is not three residentials.

21          THE COURT:  The first two were not residential?

22          MS. FERNANDEZ:  They were out-patient.

23          THE COURT:  The July '08 and the April 2, '09.

24          MR. SREBNICK:  Yes.  July was not a facility.

25   July was just individual consultation with a private person.

Page 10

1    A doctor.  It was not a facility, so to speak.

2              MS. FERNANDEZ:  It was private treatment within a

3    clinic.

4              MR. SREBNICK:  Private treatment.  Private

5    counseling.

6              THE COURT:  Okay.

7              MR. SREBNICK:  So he went from private counseling

8    to out-patient program -- excuse me -- to an in-patient

9    program which was called Holistic.  Holistic was not

10   equipped to handle the complications associated with

11   Mr. Diveroli's diagnosis.  --

12             THE COURT:  April was private treatment as well?

13             MS. FERNANDEZ:  Yes, sir.

14             THE COURT:  Okay.

15             MR. SREBNICK:  When we say "private," it is all

16   paid for by Mr. Diveroli, if that is what we are talking

17   about here, yes.

18             THE COURT:  So he actually went there?

19             MR. SREBNICK:  Paid for it.

20             THE COURT:  Daily.  He didn't sleep there?

21             MR. SREBNICK:  No.  He did sleep there.

22             THE COURT:  Okay.  Okay.

23

24             MR. SREBNICK:  But then he was discharged and a

25   different facility was selected for him that could better

1   address all of his needs.  That's called Wellness.

2            MS. FERNANDEZ:  The Wellness Center.

3            MR. SREBNICK:  The Wellness Resource Center.

4            THE COURT:  And that was when?

5            MR. SREBNICK:  That was the May facility.

6            THE COURT:  Okay.

7            MR. SREBNICK:  He went into June, and he was living

8   there.  Mr. Shapiro and I actually visited him there.

9            THE COURT:  Okay.

10           MR. SREBNICK:  He is discharged from there after

11  completing the residential component of his treatment, and

12  then he starts out-patient at what we call the Village as

13  part of continuing care for the issues that he now obviously

14  has a history of.

15           THE COURT:  Got it.  Okay.  You can continue.

16           MS. FERNANDEZ:  In August of '09, Your Honor,

17  approximately a month later or 3 weeks after he is basically

18  out on the out-patient treatment, he is arrested for a DUI

19  by the Miami Beach Police Department.  That case is a pending

20  matter, I believe scheduled for trial --

21           THE COURT:  Okay.

22           MS. FERNANDEZ:  -- the last I checked is November

23  9th.

24           MS. FERNANDEZ:  The Probation Office from what I

25  understand  --

1           THE COURT:  Now, in that case there is blood

2   testing and all of that stuff?

3           MS. FERNANDEZ:  There was blood testing.  The

4   toxicology reports I think are still pending on this matter.

5           One of the issues on this matter has been the fact

6   that the combination of some of the medications that

7   Mr. Diveroli is on for a number of health issues may have

8   contributed to the readings, but we don't have a final report

9   on that.

10          THE COURT:  Okay.

11          MS. FERNANDEZ:  It is a pending matter.

12          THE COURT:  Yes.

13          MS. FERNANDEZ:  And for that reason, one of the

14   reasons when he took a change of plea in front of Judge

15   Lenard on August 28th, we asked the court to add an

16   additional condition to his release, that he be prohibited

17   from driving, and it is my understanding to date he is

18   continuing with that restriction where someone drives him to

19   and from, you know, either business matters or medical issues

20   or religious concerns that he has.

21          Then on September 8th of '09 is when he submits a

22   urine specimen that tests positive for cocaine.

23          THE COURT:  Okay.  Anything else?

24          MS. FERNANDEZ:  That is the chronology, Your

25   Honor.

1          THE COURT:  I believe there is another issue with

2    respect to failure to use the code-a-phone.

3          Is that part of this petition?

4          MS. FERNANDEZ:  This petition.  And I would defer

5    to the U.S. Probation Officer.  I think there were one or

6    two instances, is that correct, that he failed to use the

7    code-a-phone.

8          I think on one of those I know he was with or he

9    may have been in court with us preparing for a hearing.

10         No excuse.  Absolutely no excuse.  He could have

11   used the phone, but there were those one or two instances.

12         THE COURT:  Okay.  You seem to be rambling a

13   little bit.

14         MS. FERNANDEZ:  I am sorry?

15         THE COURT:  You are rambling.  I am not sure I

16   understand what you just said.

17         MS. FERNANDEZ:  No, no.  There were those two

18   instances where he did fail to use the code-a-phone on a

19   timely basis.

20         THE COURT:  Okay.  Anything else?

21         MS. FERNANDEZ:  That's all, Your Honor.

22         THE COURT:  Okay.  This is very interesting.

23   Apparently he has been blessed with a lot of resources.

24         He has been into a number of different treatments

25   and the Wellness Center and the Village, and apparently

1    somebody has really cared for him very well, but the bottom

2    falls out when he tests positive for cocaine while he is out

3    on bond.  What do you want me to do with him?

4         MS. FERNANDEZ:  Your Honor, some of the

5    recommendations that we have been talking about is basically

6    giving him one more opportunity where we increase the role

7    of the government in terms of knowing more about what are

8    these private treatments about; more reporting to the U.S.

9    Probation Office and increasing the actual number of days.

10        One of the proposals we had was that he would

11   basically go every day Monday through Saturday to continue

12   his psychotherapy with the current clinician.

13        Secondly to attend NA and AA meetings four times a

14   week, to be verified by a sponsor; again, reporting all of

15   these additional conditions to the U.S. Probation Office.

16        In addition to that, Your Honor, we would submit

17   that he would be attending his current out-patient therapy

18   for three evenings a week and providing urine specimens

19   during those three visits.

20        In addition, we would also request a curfew of 7

21   days from 10:00 p.m. to 7:00 a.m. of the following morning,

22   and he would be on electronic monitoring, and the defendant

23   would bear that cost.

24        He would continue his drug testing which is

25   currently twice a week by the U.S. Probation Office in

1    addition to the testing at the facility.

2              THE COURT:  You know, I am troubled by this.

3              I mean, this guy, this gentleman has been given a

4    great opportunity.

5              You know, he has spent a lot of money on trying to

6    do the right thing, or somebody has spent money, and he still

7    broke the law while he is out on bond.

8              I am trying to understand why so much deference is

9    coming from the United States Government on this case.  Is

10   there something that I don't know?

11             MS. FERNANDEZ:  No.  We feel the same.  We are in

12   the same position, and we feel the same, Your Honor.  If the

13   court is inclined to give him one more chance, we thought of

14   what are the --

15             THE COURT:  On what basis?

16             MS. FERNANDEZ:  Just on the basis of giving him an

17   opportunity to come clean and rehabilitate himself one more

18   time.  Other than that, then we are in agreement that this is

19   a matter that --

20             THE COURT:  Counsel, what can you do other than put

21   him in private treatment twice; put him in the Wellness

22   Center, put him in the Village care, have a psychologist for

23   him, what else can you do?

24             MS. FERNANDEZ:  Because I believe part of the

25   problem, Judge, has been that it has been at private

1   counseling, private facilities where I am not sure we have

2   had the kind of reporting or the kind of control, we, meaning

3   the United States Government or the U.S. Probation Office,

4   where we are not monitoring what is happening at that

5   private facility, and perhaps, you know, we don't really

6   have a clear picture of how much he has violated.

7              THE COURT:  Okay.  Let me do this:  Let me speak

8   to his defense lawyer.

9              MS. FERNANDEZ:  Thank you, Your Honor.

10             THE COURT:  Because you are the government lawyer

11  here.

12             MS. FERNANDEZ:  Sure.

13             THE COURT:  Okay.

14             MS. FERNANDEZ:  Okay.  Thank you.

15             THE COURT:  You sounded like a defense lawyer here

16  for a while, but before I do that, I want to hear from the

17  probation department and what is their take on this

18  situation.

19             Who is here from probation?  I think there was

20  someone.  Okay.

21             MS. ESTIVAL:  Yes, Your Honor.  Lora Estival, U.S.

22  Probation.

23             THE COURT:  Okay.

24             MS. ESTIVAL:  Your Honor, I do agree with the

25  court, and that's why I have asked for this hearing to show

1   cause why he should not be remanded because he has been

2   afforded every opportunity to come clean and to remain drug

3   free and not violate the law while out on bond, and that's

4   why, you know, my position is to ask for remand pending

5   sentencing.

6           However, I understand the defense counsel is

7   proposing, as a last resort, some additional sanctions to, if

8   Your Honor is not inclined to do so, and at the very least I

9   would want the curfew with electronic monitoring, but that

10  does not prevent somebody from using drugs, Your Honor.

11          You can get then at your home.  He would have all

12  day to be out attending treatment and we would not know his

13  whereabouts other than, you know, that he is out.

14          The curfew of electronic monitoring would only

15  monitor him during those hours of 10:00 p.m. and 7:00 a.m.

16          During the day he would be free to come to the

17  Probation Office and do his counseling, but, again, there is

18  no guarantee that he will not violate the law or reuse drugs.

19  There is no way of knowing that.  Only he knows that.

20          THE COURT:  Okay.

21          MS. ESTIVAL:  And that's my position Your Honor.

22          THE COURT:  Okay.  Defense counsel.

23          Counsel, let me ask you this question:  If you

24  have another situation with a young man who does not have

25  the resources to go into these private treatment centers and

1   these other places that he has gone to, and he shows up

2   positive for cocaine, and he is remanded, what makes this

3   any different than that situation, other than the fact that

4   he has money and can buy himself into treatments and get all

5   of this care and still not do what he is supposed to do?

6        Isn't he in a worse off situation than the guy who

7   didn't have any money to enjoy the benefits of all of this

8   therapy that he has had?  Do you understand my question?

9        MR. SREBNICK:  I understand your question.

10        THE COURT:  Okay.

11        MR. SREBNICK:  And I think we start with the point

12   that he admitted from day one, when he came into this court a

13   year and change before he was under any bond conditions, that

14   he has a history of addiction.

15        So we start with someone who is an addict.  Okay.

16   Who admitted as much when he first came into the system.

17   Start there.

18        Number 2, we now know he has been diagnosed with

19   psychiatric issues that have gone untreated for, I mean he is

20   only 22 years old as we look at him today.  He may look a lot

21   older, but he is a 22 year old person.

22        So he is a young person who went for 21 years

23   untreated for his psychiatric issues; a family, and I could

24   get into all of the circumstances, parents that are

25   nonfunctional.  He has basically raised himself since the age

1  of 14 years old.

2          THE COURT:  We have young kids in the innercity

3  with the same problems.

4          MR. SREBNICK:  That's right.

5          THE COURT:  And they are sitting in jail.

6          MR. SREBNICK:  Well, most of them are not sitting

7  there for just simply testing positive, Judge.

8          THE COURT:  Okay.  Go ahead.

9          MR. SREBNICK:  Okay.  Testing positive means

10  personal use, and we are not talking about distributing

11  drugs.

12          He is not on the street trafficking or anything

13  like that.  He is abusing himself, and the person who is

14  suffering the consequences are him, and it is hardly a

15  pleasure for him to submit to residential treatment that he

16  himself paid for out of his own pocket, not his mother or

17  father, not the government, not some benevolent third-party.

18          He paid for it himself.  So at least he has got the

19  awareness to know that he needs treatment, and that's a good

20  start.

21          It is not the end.  We understand.  And so the fact

22  that he has reached into his own pocket, put himself in

23  residential treatment and paid for it, shows that at least,

24  you know, he has gotten the first step, and then he fails

25  from time to time.  We understand that that's the history of

Page 20

1    addicts.

2            THE COURT:  He has failed more times than this one

3    time that he has come up positive?

4            MR. SREBNICK:  He failed using cocaine.

5            THE COURT:  Yes.

6            MR. SREBNICK:  This most recent time.

7            THE COURT:  Yes.

8            MR. SREBNICK:  Okay.

9            THE COURT:  He has failed more than this time in

10   September?

11           MR. SREBNICK:  Well, that's the only time he has

12   failed this court, but in his life he has failed by using

13   drugs, and he admitted as much.

14           And so he is trying to do his best over the last

15   year in change.  He did fail the court by testing positive

16   this last time.

17           And so the question is are we here to punish him or

18   are we here to make him better?  Because I think maybe we can

19   accomplish both in one shot, and I think we can do that,

20   Judge, by addressing the psychiatric and addiction issues

21   that are obviously confronting this 22 year old man who,

22   fortunately, does have the resources and the interest in

23   solving this problem.

24           Let me make sure we understand that he is a

25   chemically dependent person to begin with.  In other words,

1   doctors have determined that he needs to be proscribed

2   amphetamines, sleep medication.

3           All sorts of chemicals need to be pumped into his

4   body to create an equilibrium that doctors are satisfied

5   with.

6           Untreated, his equilibrium, Judge, is out of whack

7   psychologically.  So you are talking about someone who is

8   not blessed witness with the kind of, you know, chemical

9   brain stability that 90 plus percent of Americans are.

10          So we are trying to evaluate the brain of somebody

11  who is not blessed with a normal brain.  So doctors have

12  determined he has to take a regime of medications every day

13  that hopefully will stabilize him, although he has sleep

14  disorders and all sorts of problems in that range, but

15  fortunately, he is under the care now of doctors who seem to

16  be addressing those issues.

17          So now what do we do about his single failure in

18  the year and a half, in terms of drug testing, to comply with

19  the court's conditions?

20          When we say he has been given other chances, I am

21  not sure what we mean by that.  To my knowledge, this is the

22  only reported violation of his conditions of bond.

23          We are here for the first time, as I understand it,

24  on a violation of his condition of bond which we readily

25  admit to because he is not denying that he has a drug abuse

1   problem.

2          So here is what we are asking the court to do:  We

3   are asking the court to address it head-on by addressing the

4   issue.  The issue is his drug addiction.

5          Doctor Strumwasser is here and available to answer

6   any questions you have.  He has been treating Mr. Diveroli

7   for over a year and doing the best that he can with someone

8   who went undiagnosed for 21 out of the 22 years.

9          And so what we are proposing is a strict curfew

10  from 10:00 to 7:00 every night; electronic monitoring every

11  day of the week, Monday through Sunday he is receiving some

12  form of intensive therapy.

13         Monday through Saturday, an hour a day with his

14  private psychologist.  In addition to that, four days a week

15  AA or NA meetings the other three days at the Village which

16  has the evening sessions 3 hours, three days a week.

17         All of this will be monitored both by Doctor

18  Strumwasser and by the United States Probation Office and

19  the United States Government.

20         I believe those restrictions on his conditions of

21  release directly address his issue.  And if I may have a

22  moment?

23         THE COURT:  You may.

24         MR. SREBNICK:  Judge, I am reminded by Doctor

25  Strumwasser that Mr. Diveroli is also being attended to by a

1   psychiatrist, so a medical professional once a week, and

2   there have been major adjustments to the medications that

3   Mr. Diveroli is on.

4           Again, we are not trying to excuse his violation of

5   using cocaine.  That is certainly not one of the medications

6   he is supposed to be using, but, in any event, I use that to

7   highlight the point that the doctors understand that

8   Mr. Diveroli requires medication to reach a level of

9   stability.

10          I note that we are now on October 7th, and there

11  have been no additional positive tests since the infraction

12  that brings us before the court.

13          So we have in one year in change on an addict, we

14  have one positive drug test, and so we can call it a last

15  chance, but it is the first violation.

16          No violation is acceptable, but at least we

17  understand what challenges he was facing over year ago.

18          I don't use this to belittle drug use, but I will

19  use tobacco as a perfect example of how difficult it is for

20  people to break an addiction.

21          These are not simple matters, particularly with

22  someone with a documented psychological-psychiatric

23  disorder, and so we are requesting the court to give him an

24  opportunity to continue, through a more increased therapy

25  his road to recovery.  And if I could have one minute with

1    the government?

2              THE COURT:  All right.

3              MR. SREBNICK:  Judge, I only have one other thing

4    to advise the court.

5              One of the things we have done is introduce

6    Mr. Diveroli to the Olif Institute, which is an organization

7    based here in Miami under the supervision of Rabbi Shalom

8    Lipskar, L-i-p-s-k-a-r.

9              Rabbi Lipskar has about 30 years of experience

10   dealing with individuals that are either incarcerated or

11   facing incarceration, and I personally made the introduction

12   so that Efraim could begin giving back to the community, and

13   I am happy to report that they have begun a very good

14   working relationship doing charity work, and Efraim who is

15   blessed with a comfortable financial situation is able to

16   participate meaningfully, giving of his time and his own

17   resources.

18             I will conclude just by, you know, pointing out the

19   obvious.  He is 22 years old, Judge.  It is the first time

20   that he has ever been in court.

21             This is not, you know, someone with a rap sheet a

22   mile long.  This is someone who has a long term help mental

23   health issue that he himself is trying to address.

24             I would ask the court, you know, to recognize the

25   challenges he is facing and the efforts he is making and

1    consider allowing him, through his medical professionals, to

2    continue addressing it, rather than simply, you know, putting

3    him in a cage where he is not going to be able to receive

4    that kind of quality treatment.

5           Certainly he will not be able to receive it at

6    FDC, which is where they would put him pending sentencing.

7           THE COURT:  Okay, counsel.  Thank you.

8           Counsel, you said something that stayed in my mind

9    the whole time that you were making your presentation.

10          You said to me the purpose, is it to punish him or

11   make him better?  What is the purpose?  Is it to punish him

12   or make him better?

13          I have a problem with that.  Apparently he has

14   committed a crime.  He has pled guilty and he is awaiting

15   punishment.

16          MR. SREBNICK:  Yes.

17          THE COURT:  When it comes time for him to be

18   punished, are you going to tell the punishing judge or the

19   judge who will sentence him, should this be about making him

20   better or punishing him?

21          Do you have the same argument then?

22          MR. SREBNICK:  No.  There is no doubt that when the

23   judge sentences him, punishment for the crime to which he has

24   pled guilty is the factor that will be considered, although

25   there are other factors naturally under the guidelines.

1              THE COURT:  I understand.

2              MR. SREBNICK:  I agree.

3              THE COURT:  I understand.

4              THE COURT:  I understand, but what we have here is

5    we have a man who is waiting for punishment.  And while

6    waiting for punishment, he uses an illegal substance, to wit:

7    Cocaine, which is a violation of the law and a violation of

8    his release.

9              He has not been charged with that.  I mean, it was

10   in his system.  Nobody has charged him with it, and that's

11   okay, but he broke the law again while waiting to be

12   punished.

13             I mean, we just cannot keep saying that because of

14   his upbringing and because of his psychological problems, I

15   mean that, you know, we should be concerned about his

16   problems rather than doing what the court inevitably will

17   probably do, and that is punish him.

18             I just don't feel that my position right here

19   today should be about the business of making him better, you,

20   know.

21             It seems to me that the only thing that has been

22   done so far are efforts to make him better, and it has not

23   worked out.  It just has not worked out.

24             Perhaps the thing that will make him better is for

25   him to understand that the system ain't playing with him, you

Page 27

1    know.  This is serious business.

2            You commit crimes, you breach conditions of your

3    release by using narcotics, and then the question becomes,

4    well, what about him?

5            You know, what can we do to make him better?  The

6    system does not work like that, you know.  It works that way

7    to some extent for juveniles, but this is not a juvenile.

8            The bottom line is that he has breached the

9    conditions of his release.  And based upon the history of

10   trying to make him better that has apparently failed, I

11   don't see why this court should not remand him.

12           I believe that if he is remanded he will be able

13   to get his meds and all of those things that he is taking

14   right now, but I just don't see how or why this gentleman

15   deserves another chance to get himself better under these

16   circumstances.

17           Having said that, I don't think I have a choice to

18   but to remand him.

19           THE DEFENDANT:  Your Honor, can I address the

20   court, please?

21           THE COURT:  If your counsel will let you do so.

22           THE DEFENDANT:  Your Honor, I have been struggling

23   with a drug problem since I was 16 years old.

24           I worked.  Like I said, I have been to multiple

25   treatment centers.

1       You know, in the treatment center, the mentality

2   is, you know, every day is a new day and, you know, for an

3   addict like one day clean is like a year, and like that with

4   what my attorney said, in a year and a half I had one

5   violation.

6       I had one dirty urine in a year and a half, and I

7   could swear to you at this moment that you will not see me

8   in this courtroom again because if by some goodness in your

9   heart give me a chance to please not be remanded today, I

10  will continue with my treatment and I will not piss dirty

11  again.

12      I really can commit to that statement, sir, Your

13  Honor.  I will.  I mean, that is just a commitment.  I am

14  working on myself every single day.

15      I am reading different books about self-help and

16  occupying my time in much more constructive ways and

17  associating with different people who are not, you know,

18  drug users and thus eliminating the opportunity for me to

19  use drugs and to, you know, I know this is no excuse

20  whatsoever, but, you know, the thought of going to prison,

21  which I will probably will end up getting some prison time at

22  some point here, has been extremely stressful for me and, you

23  know, that night that I used, I just thought, you know,

24  about that, and I could not comprehend it, and I just ended

25  up doing something that I really should not have done, and

1  that was using cocaine.

2          I really am sorry, and I beg the court, I beg the

3  court to please reconsider.  I beg the court to please

4  reconsider and give me one last opportunity to stay clean 100

5  percent pending my sentencing, and I will work on myself on

6  minute-by-minute and hour-by-hour and on a day-by-day basis

7  to do so.

8          I am not trying to give you lip service here.

9  Obviously, I am trying to save my own skin, but at the same

10 time I believe everything that I am telling you, and I want

11 you to believe me and I want you to believe in me that I can

12 and will control this problem and eventually 100 percent get

13 it behind me because you know, whether I go to prison,

14 whether I go to prison or not, I want a future.

15         I want, you know, a family one day.  I want all of

16 those things, and drugs simply are not going to be a part of

17 that, and that's all I have to say.  Thank you, Your Honor.

18         THE COURT:  Okay.  Anybody else?

19         MR. SREBNICK:  One moment, Judge.

20         THE COURT:  All right.

21         MR. SREBNICK:  One more moment, Judge.

22         THE COURT:  All right.

23         MR. SREBNICK:  Judge, if you will permit, the

24 doctor has some comments he would like to make that he is

25 better able to make, since he is the expert on this, if the

Page 30

1    court would hear from him?

2           THE COURT:  About what?

3           MR. SREBNICK:  About the medication issue that will

4    be important.  He will just take two minutes just to alert

5    the court to his medical opinion.  Would that be acceptable

6    to the court?

7           THE COURT:  Yes.

8           MR. SREBNICK:  This is Doctor Steven Strumwasser.

9           THE WITNESS:  Good morning, Your Honor.

10          THE CLERK:  Please raise your right hand.

11          THE WITNESS:  Yes.

12       STEVEN STRUMWASSER, DEFENDANT'S WITNESS, SWORN.

13                    DIRECT EXAMINATION

14          THE CLERK:  Please state your name and spell your

15   last name for the record.

16          MR. SREBNICK:  Steven Strumwasser,

17   S-t-r-u-m-w-a-s-s-e-r.

18          THE CLERK:  Please state your profession.

19          THE WITNESS:  Licensed clinical psychologist and

20   certified addiction professional.

21          MR. SREBNICK:  Steven, if you could just introduce

22   yourself to the judge, and just very briefly your

23   background.

24          THE WITNESS:  Sure.  I have been in practice for

25   29 years, and one over the reasons that I felt compelled to

1    address the court is on two separate reasons.

2         Number 1, I have been an expert in this particular

3    field for a very long period of time and have run and

4    directed facilities, not only for the Department of

5    Corrections, but for the Federal Bureau of Prisons as far as

6    halfway houses go.

7         It has never been a difficulty to call the marshals

8    and send someone to prison.

9         I am also internationally certified as an addiction

10   alcohol counselor.  The compelling issue here for me is the

11   psychiatric issues which have really I think is a large part

12   of this particular case which have never been adequately

13   addressed until approximately the last year.

14        Mr. Diveroli is on a plethra of psychiatric

15   medications that are not just for depression and are not just

16   for anxiety, but for a thought disturbance.

17        Putting him into a particular type of environment

18   like FDC, which I am quite familiar with, and have gone many,

19   many times to see individuals there, I know factually that

20   he will not be able to receive the type of medications that

21   he is on at this particular time.

22        He also will not be able to receive the type of

23   support that, again, this young man really requires.

24        I know that eventually he will have to go into a

25   prison, most likely.  That appears like that is what is

 1    going to take place.

 2            However, I have been working with individuals for

 3    many, many years and preparing them for that particular

 4    process when the opportunity arises, and at this particular

 5    point we are just not there yet.

 6            To incarcerate Mr. Diveroli at this particular

 7    time would be extremely dilatorious, not only to his health

 8    of this 22 year old young man, but also it would I believe

 9    would cause some very, very severe psychiatric problems that

10    we are not dealing with just an individual who is depressed

11    because he is going to jail or depressed because, you know,

12    he got arrested.

13            There are other issues here that are much, much

14    more dramatic and much, much more involved.  And, again, I

15    believe that incarceration at this particular time will do

16    nothing but have him regress and potentially, based on his

17    psychiatric issues, could cause everlasting harm to this

18    individual.

19            I would like the opportunity to continue to work

20    with Mr. Diveroli and to prepare him for what may be the

21    eventual, but today, if you will, Your Honor is not that

22    particular day.

23            So I am asking, as well, for this opportunity to,

24    you know, we have accelerated dramatically and increased the

25    interventions that are there that are actually quite

1   iron-clad, and I do not believe that Mr. Diveroli is going

2   to step out of line at this particular time.

3          If he does, and I am aware of that, I share the

4   court's, and I base my reputation on this, of course, doing

5   this particular line of work, that the appropriate

6   authorities will be informed immediately, but I do believe

7   that he is now in a particular structure that will afford him

8   what I think that actually he deserves.

9          I know that you spoke with issues about, you know,

10  private care.  I don't think that someone should be, if you

11  will, penalized for that.

12         The transition or actually the amount of

13  facilities that it sounds like he has been in actually are

14  transitional facilities.

15         So when someone goes into residential care, they

16  naturally go to out-patient facility.  And when he left

17  Holistic Health, which is a drug and alcohol rehabilitation

18  center, the next facility that he went into was not a drug

19  and alcohol rehabilitation facility.

20         That is primarily a psychiatric facility where he

21  was there for 56 days dealing with psychiatric issues.

22         Holistic Health, which is a good facility and has

23  been around for a very, very long time, I am sure you have

24  heard of them, is not equipped to address the profound

25  psychiatric issues that Mr. Diveroli has.

1        So thank you for listening to me, and I hope that

2   you can provide him one more opportunity, this gentleman.

3   This young man.

4        THE COURT:  Well, there are a lot of people that

5   cannot do time, but they do time.

6        MR. STRUMWASSER:  Of course.

7        THE COURT:  And there are a lot of people who are

8   on drugs and need to still involve other people to get money

9   to buy drugs.

10       He didn't have the to go that route because he has

11  money.  He is in a different situation.  He is in a softer

12  situation, and it appears that it is becoming even softer for

13  him.

14       MR. STRUMWASSER:  I am not sure when you say, if I

15  may, softer.

16       THE COURT:  Well, you know, it seems like he has

17  had every opportunity.  Everything has been so soft for him,

18  and sometimes you have to scratch your head and say, you

19  know, this whole drug mess, you know, especially when you

20  seem to have everything going for, you know, there is folk

21  who don't have anything going for them, and you can

22  understand their frustration with life and why they turn to

23  drugs, but in a situation where you seem to have everything,

24  and then you make a choice to be a drug addict, you make a

25  choice to break the law and you make a choice to offend the

1  court by not adhering to the conditions of your release, I

2  mean --

3           MR. STRUMWASSER:  May I address that particular

4  issue?

5           THE COURT:  Sure.  I mean, you can tell me that he

6  is crazy.  You can tell me that he is emotional, but he is

7  also, you know, I mean at some point in time he is going to

8  have to, you know, pay the price for what he has done.

9           MR. STRUMWASSER:  I agree.

10           THE COURT:  I don't know if you are ever going to

11  be able to get him ready for that based upon what you have

12  said.

13           MR. STRUMWASSER:  Well, I know that Mr. Diveroli,

14  if you will, it may appear because he is able to pay for

15  things at this particular point in life, had an easy time of

16  it.

17           I have gotten to know him very well, as well as

18  his family.  This individual, if you will, he started behind

19  the 8-ball before he even started.

20           There are particular issues in his family system

21  which are probably not appropriate to speak in this type of

22  venue, but certainly when one is abandoned by one's family

23  as a young teenager, it becomes very, very difficult,

24  especially when one is predisposed to experiencing an impact

25  like that, where an individual without psychiatric issues,

1    it is a 50 pound impact for some without psychiatric issues,

2    and with psychiatric issues, an individual is going to

3    experience that as crippling, as a 200 pound impact.

4            The other issue that I would like to address is

5    that for many, many years I have been preparing individuals

6    who are eventually going to be incarcerated, and there is an

7    impact with that particular process.

8            I would like to see it as, you know, a generalized

9    condition where individuals could prepare for the type of

10   shock that they experience.

11           I do believe that incarceration has its place.  I

12   also believe, as a society and as a community, that we can

13   do things to prepare individuals for this type of situation,

14   as well as to prepare them so they can withstand that, and

15   when they get out, they are not so demoralized where we

16   continue this horrific recidivism rate that we experience in

17   our culture and of the criminal justice system in the United

18   States.

19           There needs to be much, much more attention paid

20   to these particular type of things.  I have been working with

21   the government for years and discussing different types of

22   strategies to implement where when the individual steps out

23   of that horrific shock, that they actually can seamlessly,

24   if you will, enter the community and see that in a

25   particular light and ingest that the incarceration in such a

1   way where the recidivism rate is dramatically reduced.

2            I think that we need to pay attention to that.

3   Part of that is how you walk in the door.

4            THE COURT:  Yes.  You are right.  It is part of

5   how you walk in the door.

6            MR. STRUMWASSER:  Yes.

7            THE COURT:  Part of it.

8            MR. STRUMWASSER:  Yes.  And, unfortunately, I am

9   sure you are well aware of this as I am, 78 percent of the

10  psychiatric facilities across the United States have closed

11  in the last 35 years, and in the criminal justice system

12  there are 2.2 million individuals in prison today, that

13  there is at least 65 percent of those individuals with a

14  dual diagnosed problem that is definitely not adequately

15  treated.

16           I do believe right here and right now it does

17  create an opportunity to make a little bit of a shift and a

18  little bit of a change.  We can do that.

19           It is horrifically sad and, you know, personally

20  and professionally, I am extremely apathic towards

21  individuals that do not have, it is so much harder for them,

22  and I think that is why we need to try that much harder for

23  those, if you will, that do to start to set examples and to

24  be able to demonstrate, hopefully empirically, that there

25  are things that can help, and that they should be afforded

1   to other individuals, but because one has the ability to do

2   that, I don't think that should, if you will, be a factor to

3   be compared.

4              THE COURT:  Well, I am not sure that what you are

5   trying to do is going to make a difference in him.  And the

6   truth of the matter is that these things that you share with

7   me are not defenses to the crime that he committed and not a

8   defense to the fact that he breached the conditions of his

9   release.  And since they are not conditions -- I mean since

10  they are not defenses, I mean he is going to have to go

11  sooner or later.

12             MR. STRUMWASSER:  I agree.

13             THE COURT:  You know, what can you do for him now?

14  Perhaps maybe if somebody had showed him the hard way

15  sometime earlier in his life, maybe he would have

16  straightened up, you know, as opposed to --

17             MR. STRUMWASSER:  I don't know

18             THE COURT:  -- probably have given him everything.

19  Maybe if he had, you know, gone and seen the inside of a

20  jail, maybe it would have straightened him up.  I mean, who

21  knows, but are you basically continuing to pacify this young

22  man?  Is that what this is really all about?

23             MR. STRUMWASSER:  I do not see that.

24             THE COURT:  The same thing that has happened to

25  him, the same thing that has probably made him screwed up,

1    the same thing that you are probably trying to do right now

2    is to show him leniency and pat him on his butt.  You know,

3    maybe that's this worst thing that could happen to him.

4         MR. STRUMWASSER:  Well, my experience is that if

5    this individual was shown, if you will, a harder life, let's

6    say he was arrested 5 years ago, would that have impacted

7    him today?

8         In many instances that does help, but I know that

9    you know that statistically that actually that does not, and

10   the earlier an individual is incarcerated, the statistics

11   bear out that the sequela for that has a worse outcome; that

12   individuals, the earlier that they are incarcerated leaves

13   such a horrific scar that it stays with them for the rest of

14   their life, and it is very, very difficult to heal.

15        Simultaneity, you know, there are individuals who

16   will learn from that, but my experience, and it is borne out

17   statistically and empirically that individuals with

18   psychiatric disturbances have a far, far worse outcome for

19   that type of intervention for punishment, and it continues

20   to be shown, even by the Federal Bureau of Prisons that they

21   are beginning to deeply rethink what they are doing because

22   it continues to show that punishment does not seem to have

23   the effect that the criminal justice system hoped that it

24   would.

25        I do believe that this individual really requires,

1   and if he can have that advantage, if you will, if he can

2   have that opportunity to prepare for what appears to be the

3   inevitable, and I don't see how it will be any negative

4   consequences to the courts or the criminal justice system at

5   this particular time if he does have one more opportunity.

6          There are so many safeguards in place; three urines

7   at the Village, two urines with the United States Probation

8   Office, one call a week with the United States Probation

9   Office, 6 individual sessions per week, seeing a

10  psychiatrist that once a week, wearing a monitor, those

11  particular strategies and interventions seem like a step

12  that will either assure that this individual does what he

13  needs to do, or that he will have, if you will, wasted his

14  last opportunity, but I also want to say that relapse is,

15  unfortunately, part of the picture with individuals who have

16  drug issues.

17         However, relapse, in the context of an individual

18  with a psychiatric disorder and a drug disorder, is that

19  much more likely to occur.

20         I do think that this individual, who has only one

21  positive urine test in 16 months, I think that actually

22  shows a tremendous amount of progress and demonstrates that

23  there is an awful lot that has occurred that has been

24  fruitful.

25         THE COURT:  I understand, and that's well-spoken,

1   you know, from a doctor.  This is the criminal justice

2   system.  The law has been broken.

3           Let me ask the government, and I really appreciate

4   your comments.

5           MR. STRUMWASSER:  Thank you.  I appreciate your

6   listening to me so much.  I am a little verbose, but that's

7   what psychologists do.

8           THE COURT:  You are good.  You are very good.

9           MR. STRUMWASSER:  Thank you.

10          THE COURT:  You are very good.  Government, you

11  indicated that at the beginning that the Probation Office

12  was on board with your recommendation that all three parties

13  were on board, the defense, the government and probation.

14          I am not so certain that you and probation are on

15  the same page.  What I am going to do is give you an

16  opportunity to talk to probation for 5 minutes, and let's see

17  if you guys are on the same page.  Okay?

18          MS. FERNANDEZ:  Yes, sir.

19          THE COURT:  Okay.  We will be in recess for 5

20  minutes.

21              [There was a short recess].

22          THE COURT:  Okay.  Government where are we at?

23          MS. FERNANDEZ:  Your Honor, in discussions with the

24  probation officer, I understood --

25          THE COURT:  I want you to speak up, ma'am.  The

1    microphone does not capture your nice voice.

2         MS. FERNANDEZ:  I am sorry.  Your Honor, in

3    conversations with the probation officer it was my

4    understanding that she had agreed that modifications of the

5    bond could be addressed as some of the suggestions that you

6    have heard here today in lieu of revocation.

7         Today she has now explained to me that she may

8    have led me to believe that, but where she sits here today is

9    that if the court is not inclined to revoke probation, the

10   Probation Office would be in agreement with the additional

11   special conditions that have been suggested.

12        THE COURT:  So that I understand, what is the

13   basis for your position that you have taken?

14        MS. FERNANDEZ:  My position is, Judge, that I have

15   wanted to work with this individual.

16        THE COURT:  Why?  Why?  What is it about this

17   individual?  We see a lot of people.  What is it about this

18   individual?

19        I have seen people who have done less that were out

20   on bond that go in and are remanded.  What is so special

21   about him?

22        MS. FERNANDEZ:  Nothing special about him, Your

23   Honor.  The only thing is as I saw the one violation which I

24   did believe was the basis, and it is definitely a basis for

25   Your Honor to go ahead and remand him, and the only

1    suggestion is, this is what I was thinking is if we give him

2    one more chance, just for purposes of working with him, we

3    are preparing and going to trial at the beginning of January,

4    we have been have been working with him.

5          He has shown up and has been assisting the

6    government on a number of different occasions.  So I had seen

7    that pattern, and to have seen this one cocaine positive

8    blew me off as well, and I thought this man needs to be

9    remanded.

10          Then I thought, well, do we give him one more

11   chance to see whether or not he can abide by the conditions

12   that we have imposed?  But, obviously, it is the court's

13   discretion.

14          I truly understand where the court is sitting,

15   saying that I have asked myself the same questions.  Perhaps

16   this man is just not taking this seriously, and the only way

17   he will take what is happening, the proceedings that are in

18   front of him seriously is by being remanded, but that was

19   the discrepancy, if you would, between us and the Probation

20   Office.

21          THE COURT:  Got it.  Anything else?

22          MS. FERNANDEZ:  No, sir.

23          THE COURT:  Counsel, anything else from you?

24          MR. SREBNICK:  Yes, I do.  I want to make sure

25   that the record is clear that this is not a silver spoon

1   child.

2           He was not given all of this money, and he worked

3   for it.  He has been working since he is 14 years old.  He

4   grew up no different than your typical kid from Miami.

5           The only difference is he was very financially

6   successful on his own.  He went to work at the age of 14.

7   So, to the extent that anyone has a picture of him as a

8   silver spoon baby, that would be a mistaken impression.

9           Number 2, notwithstanding that he made it on his

10  own, he has had these psychiatric issues.  You have heard

11  enough about that.

12          So this is not somebody who is a recreational drug

13  user because it is fun to go partying with his friends.  His

14  drug use is so that he can cope with life, which is not the

15  right way to do it, but the medical professionals thinks he

16  needs about 6 or 7 drugs a day to copy with life;

17  prescription drugs because his brain requires it.

18          So he apparently adds one more because for,

19  whatever reason, it helps him cope.  It is not an excuse,

20  but understanding that this is not a recreational user.

21          Very different than the kids that I think we have

22  been thinking about who are simply saying, "Hey, I would

23  rather go party than go to school every day."

24          He has been very successfully financially,

25  notwithstanding his psychiatric issues.

1          THE COURT:  I don't know if your argument is good

2    for him or bad for him.  Go ahead.

3          MR. SREBNICK:  Well, what I am suggesting to the

4    court is that he recognizes he has got these psychiatric

5    issues.

6          You know, they say that a camel doesn't know it has

7    its humps because it cannot see them.  And when you have a

8    brain disorder, you don't realize it because it is the only

9    brain you have.

10          It is the only way you see the world is through

11    your brain.  So he only sees the world through the brain that

12    God gave him.  He doesn't see the world the way the rest of

13    us do.

14          THE COURT:  Wait a second.  How did God into this?

15    Did he choose to use drugs?

16          MR. SREBNICK:  No, no.  I am saying the brain he

17    has that requires Adderal, Ceristol, Seroquel, medical

18    professionals say that his brain left unattended cannot cope

19    with the world, and so he does not start the way I start the

20    morning every day where I get up and I drink an orange juice.

21          He starts the morning with doctors telling him,

22    "take this, this, and this for your brain."

23          Okay.  So that's a very different person than 98

24    percent of the community.  And so I think we have to treat

25    him not like 98 percent of the world, we have to treat him

1    like the two percent of the world with psychiatric disorders?

2            And how has he done in life now?  He has certainly

3    pled guilty to a felony, and he is going to be punished for

4    that, and if he gets remanded today or remanded in three

5    months, he will get credit for time served the same.

6            THE COURT:  When is the sentencing?

7            MR. SREBNICK:  I think his sentencing is

8    currently --

9            MS. FERNANDEZ:  November 10th, Your Honor.

10           MR. SREBNICK:  November, but I believe the other

11   two defendants sentencing were postponed until February, and

12   there is a pending motion to consolidate all of the

13   sentencings.

14           So it will either be November 10th, or perhaps

15   sometime in February.  We haven't heard back from Judge

16   Lenard on that issue.

17           THE COURT:  When did he plead?

18           MR. SREBNICK:  I can't hear you.

19           THE COURT:  When did he plead?

20           MR. SREBNICK:  August 27th or 28th.

21           THE COURT:  Okay.

22           MR. SREBNICK:  And so that's it, Judge.  That's

23   the person you have before you, and you have a very capable

24   medical professional who is willing and obviously has, you

25   know, become very attached to this one patient of his and is

1    trying to help him.

2           Doctor Strumwasser is doing everything he can, and

3    the good news is you have got someone of his caliber willing

4    to treat Mr. Diveroli, and I think that should give you some

5    comfort, that there is a system in place to try to help him.

6           And given that it is the only urine analysis that

7    has tested positive, I ask the court one last time to

8    reconsider whether he needs to go to jail today versus go to

9    jail on November 10th or whatever day Judge Lenard decides

10   that it is time for him to begin serving his sentence.

11          And given the resources that we, and he, not

12   anybody else, he, himself, out of his own pocket, not from a

13   mother or a father who spoiled him, but that he is willing

14   to pay for those resources, I ask the court to consider, if

15   we need to make the curfew tighter, that's fine as well, of

16   course, but anything better than being in a cage across the

17   street where they are not going to be able to address as

18   competently the issues that are plaguing him since he was,

19   certainly since he has been diagnosed with a psychiatric

20   disorder.

21          Thank you, Judge, and we really do appreciate the

22   time you have given us.  You have been extremely patient.

23   Thank you, Judge.

24          THE COURT:  Okay.  Well, that cage across the

25   street is a place where he is probably going to end up going,

1   you know, but the question is what about now?

2          I certainly don't delight in taking someone's

3   liberty prior to being sentenced, you know, and sometimes it

4   is a difficult thing to do.

5          Initially for me this is not a difficult question

6   for me.  I mean, you violated.  You have got to go.  You have

7   got to go.  That's the way it is, but there is something

8   about this case that may warrant some additional

9   consideration.

10         To be quite honest with you, I am not really sure

11  what it is.  It is just a feeling, you know, and I am going

12  to go with my feeling.

13         I am going to give him some consideration, but I

14  hope that he is scared to death because this is a very

15  serious business, you know, and you just cannot do what you

16  want to do.

17         There are consequences.  You have been blessed with

18  an opportunity to hook up with some real fine people that

19  could articulate your situation.  Most people don't have

20  that, but that is not to say that should be the basis for you

21  having some second considerations from this court.

22         You know, I am trying to look at this situation as

23  an individual case and not look at it as something that is a

24  pattern for the way that I handle these cases.

25         Having said that, we will not remand you, but the

Page 49

1   conditions are going to be burdensome, you know.  Okay.

2   This order modifying the conditions, who drafted this?

3            MR. SREBNICK:  It was done in conjunction with the

4   two parties.

5            THE COURT:  Okay.  This is really interesting.

6   Attend NA and AA meetings.  That goes back to what the

7   regular people do, you know.

8            It is kind of after going through all of this

9   expensive stuff, you end up where my friends are, AAA, AA and

10  NA.  Drug testing how often?

11           MR. SREBNICK:  By probation it is two times a week.

12  By the Village South it is three times a week; meaning the

13  outpatient facility does its own drug testings and the United

14  States Probation Office does its own drug testing.  So there

15  are two different entities testing him.

16           THE COURT:  Probation, have you had an opportunity

17  to see this order modifying the conditions of bond?

18           MS. FERNANDEZ:  Yes, Your Honor.

19           THE COURT:  What do you say?  Is there anything

20  that you would like to add to it?

21           MS. ESTIVAL:  No, Your Honor.

22           THE COURT:  Okay.  Anything else?

23           MR. SREBNICK:  No, Judge.

24           THE COURT:  All right.  Thank you very much.

25           MS. FERNANDEZ:  Thank you, Your Honor.

Page 50

1           THE DEFENDANT:  Can I just say thank you, Your

2     Honor, and I will not you down.

3           THE COURT:  Well, don't let yourself down.

4           THE DEFENDANT:  Thank you.

5           THE COURT:  I am going to be okay.  It is you.

6     Take care.

7           THE DEFENDANT:  You, too.

8           (Whereupon the proceedings were concluded)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2        I hereby certify that the foregoing is an accurate

3    transcription of proceedings in the above-entitled matter.

4
     October 28, 2009    S/ Jerald M. Meyers
5    _____     _____
         DATE                JERALD M. MEYERS, RPR-CM
6                            Miami, FL  33128-7797

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25